## AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT

I, Special Agent Eric D. Poalino, having been sworn, state:

### INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since June 2021. I am currently assigned to the Boston Field Office, North Shore Gang Task Force ("FBI Task Force"). The primary mission of the FBI Task Force is to identify, investigate, disrupt, and dismantle violent criminal organizations operating in cities north of Boston. My responsibilities include the investigation of possible violations of federal law, including illegal possession/transfer of firearms, firearms trafficking, narcotics trafficking, and violent crimes involving firearms and narcotics trafficking. I have received training and experience in various aspects of criminal law and procedure, including electronic and physical surveillance, interrogations, stops, searches, seizures, and arrests for a variety of criminal offenses. Through my training, knowledge, and experience, I have become familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the use and trafficking of illegal firearms and narcotics, including persons involved in criminal organizations. My investigations have included the use of surveillance techniques and the execution of search, seizure, and arrest warrants.

2. I have written and/or participated in the execution of numerous search warrants resulting in the seizure of controlled substances and paraphernalia involved in the manufacture and distribution of controlled substances; United States currency, records of narcotics and monetary transactions, drug customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances, as well as the collection, expenditure, accounting, transportation, and laundering of drug proceeds. I have participated in the debriefing of numerous defendants, informants and witnesses who had personal knowledge

regarding large-scale narcotics trafficking organizations. I have participated in all aspects of drug investigations including conducting surveillance, executing searches pursuant to court-ordered search warrants, executing arrests, and participating in court-authorized Title III wiretaps of cellular phones. I have received extensive specialized training in the field of controlled substance identification, investigation and enforcement. Based on my training and experience, I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds.

3. All dates, time and amounts set forth in this affidavit are approximate. Because this affidavit is being submitted for the limited purpose of securing the requested search warrants, I have not included each and every fact known to me concerning this investigation. I make this affidavit based upon personal knowledge derived from my participation in this investigation and upon information (whether received directly or indirectly) that I believe to be reliable from numerous sources including, but not limited to, the following:

 a. My training and experience investigating drug trafficking, violent crimes, and money laundering crimes;

 b. Oral reports, written reports, and documents that I have received from other federal, state, and local law enforcement agents;

 c. Physical and electronic surveillance conducted by me and other federal, state, and local law enforcement officers;

 d. Confidential sources of information and cooperating witnesses;

 e. Public records;

 f. Business records;

    g. Telephone toll records, pen register and trap and trace information, and telephone subscriber information;

    h. Precise location information for cellular telephones;

    i. Queries of law enforcement records and intelligence databases;

    j. Execution of search warrants;

    k. Social media postings, videos and images;

    l. Review of data and information obtained by Orders issued under 18 U.S.C. Section 2703(d), and Search Warrants;

    m. Review of cellular phones searched and seized during this investigation; and

    i. Arrests of co-conspirators.

## I. PURPOSE OF AFFIDAVIT AND BACKGROUND

4. I make this affidavit in support of an application for Criminal Complaint charging Claudio MELO, a/k/a "Blue Drilla", with Conspiring to Interfere with Commerce by Robbery, in violation of 18 U.S.C. § 1951, in relation to a armed robbery and home invasion that took place on or about January 30, 2023.

5. I am familiar with Claudio MELO, a/k/a "Blue Drilla," who has a date of birth of xx/xx/1992. MELO is a Crip street gang member and is also an associate of the Big Opp Entertainment, or Brothers Over Everything, otherwise known as the BOE criminal enterprise. MELO is believed to be a distributor of pressed fentanyl pills and has conducted multiple armed robberies.

6. MELO is a convicted felon and has a number of prior arrests for crimes of violence, drug offenses, and firearms offenses. MELO's criminal record includes the following:

- Salem District Court, Docket No. 1736CR001189, charging ASSAULT DANGEROUS WEAPON, to wit SHOD FOOT. MELO was found guilty on 9/14/17 and committed for six months.

- Salem District Court, Docket No. 1736CR000640, ASSAULT AND BATTERY and DISTURBING CORRECTIONAL INSTITUTION. MELO was found guilty on 9/14/17 and committed for six months.

- Essex Superior Court, Docket No. 201200152001, charging ARMED ROBBERY, DESTRUCTION OF PROPERTY WANT OVER $250. MELO was found guilty on 7/9/12 and sentenced to 2-3 years in state prison and then 2.5 years committed after violating probation.

- Essex Superior Court, Docket No. 201200219001, charging UNARMED ROBBERY. MELO was found guilty of 7/9/12 and sentenced to 2-3 years in state prison.

- Lynn District Court, Docket No. 1113CR003788, charging LARCENY FROM A PERSON, LARCENY BY FALSE PRETENSE, and KNOWINGLY RECEIVING STOLEN PROPERTY. MELO was found guilty on 10/25/11 and sentenced to 2.5 years suspended sentence. MELO was committed for 2.5 years on 6/5/12 after violating probation.

- Lynn District Court, Docket No. 1113CR003516, charging ASSAULT AND BATTERY. MELO was found guilty on 9/27/11 and committed for 30 days.

- Lynn District Court, Docket No. 1113CR002643, charging MALICIOUS DESTRUCTION OF PROPERTY. MELO was found guilty on 11/17/11 and sentenced to probation.

- Somerville District Court, Docket No. 0910CR002678, charging THREATENING COMMIT A CRIME, ASSAULT AND BATTERY, INTIMIDATION, MALICIOUS DESTRUCTION OF PROPERTY. MELO was found guilty on 9/19/12 and sentenced to probation.

7. I am also aware that MELO was arrested by Lynn Police on January 7, 2025, in relation to Lynn District Court, Docket No. 2513CR000034, charging MELO with Armed Assault with Intent to Murder, Assault and Battery by Means of a Dangerous Weapon, and various firearm charges. I am aware from review of the police report for this incident that the charges relate to a shooting that was committed by MELO. In that case, MELO was identified by the victim as having

an altercation with the victim, and after the shooting MELO made a verbal statement on a surveillance recording of "I popped a kid."

A. **BASIS FOR PROBABLE CAUSE**

8. On January 24, 2024, investigators interviewed VICTIM-2.[1] VICTIM-2 informed investigators that while attempting to purchase a kilogram of cocaine, he was robbed of approximately $24,000 in cash. One of the robbers identified by VICTIM-2 was an individual who I will refer to as CW-2.[2] CW-2 and VICTIM-2 had known each other for several years.

9. VICTIM-2 stated that in December 2022, CW-2 offered to sell VICTIM-2 a kilogram of cocaine in exchange for $25,000. After some negotiation, VICTIM-2 agreed to the deal. During the evening hours on or about December 19, 2022, CW-2 and a coconspirator whose identity is known to me ("CC-1"), delivered a kilogram of cocaine to VICTIM-2 at VICTIM-2's apartment in Woburn, Massachusetts. CC-1 was not identified by VICTIM-2 during the transaction, because CC-1 wore a mask during the transaction, did not identify himself, and did

---

[1] VICTIM-2 is an individual whose identity is known to me. VICTIM-2 has no record of felony convictions. VICTIM-2 was engaged in drug trafficking at the time of the robbery. In order to secure VICTIM-2's testimony, VICTIM-2 was immunity for his drug offenses in exchange for his truthful testimony. I believe that VICTIM-2's information provided to investigators is truthful, because, among other reasons, it is corroborated by information from cellular devices and two cooperating witnesses described below.

[2] The identity of CW-2 is known to me. I have omitted their identity in order to protect them from potential retaliation. CW-2 has a long criminal history that includes drug, firearm, and violent offenses. CW-2 has also been convicted once on a misdemeanor crime of violence. CW-2 was previously arrested on state charges possession of fentanyl pills that may have resulted in an overdose death although the overdose death itself was never charged. That case was vacated after CW-2 agreed to work proactively on behalf of the government. After which CW-2 would be charged and their cooperation would be taken into consideration for mitigation of sentencing. CW-2 was subject to immigration proceedings. In order to be released from state custody and not deported, CW-2 received deferred action from immigration proceedings and was released. Shortly after being released from prison their cooperation was terminated after CW-2 was involved in alleged domestic dispute with a romantic partner. CW-2 was arrested on outstanding state warrants in December 2024 and remains in state custody, with immigration proceedings pending. CW-2 has agreed to plead guilty to offenses related to involvement in drug and violent offenses and agreed to cooperate and testify in order to mitigate federal sentencing. Prior to his recent arrests, CW-2 was also promised the potential for immigration benefits. I have reviewed the information provided by CW-2 and corroborated it with other independently collected information from the case, such other human sources and digital evidence from cellular phones. I believe that the information CW-2 provided the government is credible and trustworthy.

5

not speak or said very little.[3] The deal went smoothly for all parties with CW-2 and CC-1 providing VICTIM-2 with a kilogram of cocaine in exchange for approximately $25,000 cash. This transaction was described to investigators by CW-2 and VICTIM-2.

10. VICTIM-2 stated that after the initial transaction, he arranged to buy a second kilogram of cocaine from CW-2 the following month for approximately $24,000 cash. During this second transaction taking place in January 2023, VICTIM-2 stated that he was robbed at gunpoint by CC-1 and a second coconspirator, who was identified to be MELO. This robbery was described to investigators by CW-2, another cooperating witness I will refer to as CW-3, and VICTIM-2.

11. This second deal was set to take place on or about January 30, 2023, at VICTIM-2's apartment, which I have confirmed through review of text messages between CW-2 and VICTIM-2. During the evening hours on or about January 30, 2023, CW-2, CC-1, MELO and CW-3 arrived at VICTIM-2's apartment complex. CW-3 was present prior to the robbery and confirmed the identity of MELO, CW-2 and CC-1 being present in the vehicle that brought them to VICTIM-2's residence. CW-2 entered VICTIM-2's apartment with a pin code provided by VICTIM-2 to CW-2.

12. VICTIM-2 had previously placed the $24,000 in an unmarked soft black lunch box which was on a table. VICTIM-2 informed investigators the $24,000 cash was proceeds of drug trafficking that VICTIM-2 was engaged in at the time. CW-2 entered and then counted the money in the lunch box. Once CW-2 count was complete, CW-2 placed the money back in the lunch box. CW-2 then advised VICTIM-2 that CW-2's associate was coming up to drop off the kilogram of cocaine similar to the prior transaction.

---

[3] CW-2 identified CC-1 to investigators and this identification and the role of CC-1 was confirmed through review of data derived from the CW-2's cellular phone.

13. VICTIM-2 went to unlock door and observed CC-1 from the first transaction and let CC-1 into the apartment. Shortly thereafter, another male ran into VICTIM-2's apartment pointing a firearm at VICTIM-2. CC-1 then also pulled out a firearm and pointed it at VICTIM-2. VICTIM-2 was familiar with firearms and believed both guns were semiautomatic, Generation 5 Glock pistols. VICTIM-2 did not know the identity of the males but believed one of the robbers to be the same individual from the previous cocaine sale. VICTIM-2 did not know the identity of the second robber, but provided a description consistent with MELO's physical characteristics. I know from CW-2 and CW-3 that MELO and CC-1 were the two robbers who entered VICTIM-2's apartment with firearms and committed the armed robbery of VICTIM-2 to steal the cash that was intended to buy the kilogram of cocaine, which itself was believed to be drug proceeds.

14. Once in the apartment, in a forceful and threatening manner and while continuing to point their firearms at VICTIM-2, CC-1 and MELO demanded to know where VICTIM-2's money was. VICTIM-2 indicated where the cash was and told the robbers to take it. They did so.

15. CC-1 and MELO ordered VICTIM-2 to open a safe in his bedroom. VICTIM-2 opened the empty safe and when they returned to the living area, CW-2 had already left. Shortly thereafter both robbers departed with the $24,000 cash.

16. In addition to CW-2, a second cooperating witness, CW-3[4], was the fourth member of the conspiracy to rob VICTIM-2. According to information from both CW-2 and CW-3, investigators learned the following:

---

[4] The identity of CW-3 is known to me. I have omitted their name in order to protect them from potential retaliation from MELO and his BOE and Crips associates. CW-3 entered into a cooperation and non-prosecution agreement with the government in exchange for their testimony and cooperation concerning the January 2023 robbery discussed herein and other drug and firearm offenses. CW-3 also reported that they were a former user of hard drugs but had been clean for multiple years. I have reviewed information CW-3 has provided and have independently corroborated much of the information provided through the investigation, including through information from other human sources, and digital evidence such as cellular devices. Based on this corroboration, I believe CW-3's information to trustworthy, credible, and reliable.

    a. On the day of the robbery, CW-2, CW-3, CC-1, and MELO met at an apartment in Stoneham, MA to stage for the robbery. CW-3 had previously overheard CW-2 on the phone with others talking about the robbery and knew that it had been planned in advance.

    b. CW-2 and CW-3 both know the identities of the other conspirators and have been associates of theirs for a number of years. CW-2 and CW-3 confirmed that Claudio MELO was in fact one of the armed robbers. CW-3 did not know who VICTIM-2 was, other than that VICTIM-2 was a drug customer of CW-2 living in Woburn, MA. Prior to the robbery, all of the conspirators were aware that the plan was to rob VICTIM-2 of cash that VICTIM-2 was intending to buy drugs with.

    c. CW-3 reported that all four conspirators arrived at VICTIM-2's address in the same car. CW-2 went inside first while the rest remained in the vehicle. After a period of time, MELO and CC-1 entered the apartment complex while CW-3 drove around the area. Eventually CW-3 was called by CW-2 who told CW-3 to pick them up. CW-3 was unsure how MELO and CC-1 got away. Later the funds were split between CC-1, MELO, and CW-2 at the Stoneham apartment where they met before the robbery. CW-3 believed that approximately $24,000-$26,000 was stolen. CW-3 knew that CW-2 received approximately $3,000-$4,000 and the rest was split between CC-1 and MELO.

17. In summary, of the five individuals that were involved in the robbery (CW-2, CW-3, CC-1, MELO, and VICTIM-2), investigators have interviewed three of the five. Each individual was interviewed separately at different times and places, and each individual was not aware that other interviews concerning this particular crime. I have found the information that they each individually provided corroborates and is corroborated by the information I received from the others. Furthermore, CW-2 and CW-3 identified Claudio MELO as one of the armed men that stole approximately $24,000 cash from VICIM-2 at gun point. VICTIM-2 confirmed that the cash stolen during the robbery was in fact proceeds from VICTIM-2 selling cocaine, and was intended to be used to purchase additional cocaine.

## CONCLUSION

18.  Based on the foregoing, there is probable cause that on or about January 30, 2023, Claudio MELO did Conspire to Interfere with Commerce by Robbery, specifically through the armed robbery of VICTIM-2 of drug proceeds, in violation of 18 U.S.C. § 1951(a).

Attested to be telephone in accordance with Federal Rule of Criminal Procedure 4.1 on January __14__, 2025.

_____
Special Agent Eric D. Poalino
Federal Bureau of Investigation

Attested and subscribed by telephone in accordance with Federal Rule of Criminal Procedure 4.1 on January __14__, 2025.

_____
Hon. Donald L. Cabell
Chief United States Magistrate Judge

9